**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **2999TC ACQUISITIONS, LLC f/k/a MO 2999 TC, LLC, AND TIMOTHY L. BARTON** | § § § § | |
| **Plaintiffs** | § § | |
| **v.** | § § | **Case No. 3:20-cv-3229** |
| **2999 TURTLE CREEK, LLC, HNGH TURTLE CREEK, LLC, HN GREEN HOLLOW CAPITAL PARTNERS, LLC, MADISON REALTY CAPITAL, LP, VIPIN NAMBIAR, JAMES G. GLASGOW, JR., MARC ZEGEN, AND JOSHUA ZEGEN** | § § § § § § § § | |
| **Defendants.** | § § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs 2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC, and Timothy L. Barton file this Amended Complaint against Defendants 2999 Turtle Creek, LLC, HNGH Turtle Creek, LLC, HN Green Hollow Capital Partners, LLC, Madison Realty Capital, LP, Vipin Nambiar, James G. Glasgow, Jr., Marc Zegen, and Joshua Zegen, (collectively, "***Defendants***"), and respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1. Under the Restatement (Second) of Contracts, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." As detailed herein Plaintiffs, as borrower and guarantor under a contract, bring this Complaint against the lender for breach of this contractual covenant and its collusion with other entities and individuals to defraud Plaintiffs, misappropriate their state, common law and federally protected trade secret

rights, frustrate the purpose of the contract, interfere with the borrower's ability to perform, evade the spirit of the bargain, and deprive Plaintiffs of their rights under the contract.

## II. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

2. Plaintiff 2999TC Acquisitions, LLC f/k/a MO2999 TC, LLC ("***2999TC***") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1755 Wittington Place, Suite 340, Dallas, Texas 75234. 2999TC was formed for the purpose of purchasing and developing a five-star hotel and residential project on Turtle Creek Boulevard in Dallas County ("***Project***") and is the Borrower on the contract made the basis of this lawsuit.

3. Plaintiff Timothy L. Barton ("***Barton***" or "***Guarantor***") is an individual citizen of the State of Texas who resides in Denton County, Texas. Barton is an experienced Dallas real-estate developer, principal of 2999TC, and Guarantor of the contract made the basis of this lawsuit.

### B. Defendants

4. Defendant Madison Realty Capital, LP ("***Madison***"), is a limited partnership organized under the laws of the State of New York with its principal place of business located at 520 Madison Avenue, Suite 3501, New York, New York 10022. Madison is a real estate private equity firm specializing in construction lending for a variety of residential and commercial developments with whom Plaintiffs negotiated funding for the Project.

5. Defendant 2999 Turtle Creek, LLC ("***Turtle Creek***" or "***Lender***"), is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 520 Madison Avenue, Suite 3501, New York, New York 10022. Turtle Creek is a wholly owned special-purpose entity established by Madison to be the Lender of the funding

for the Project.

6. Defendant HN Green Hollow Capital Partners, LLC ("***Green Hollow***"), is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Fifth Avenue, New York, New York 10020. Green Hollow is a joint venture between HN Capital Partners, LLC ("***HN Capital Partners***"), and James G. Glasgow, Jr., and is a self-described "opportunistic" real estate investment company with extensive interests in the acquisition and development of high-end residential and hospitality-sector properties. Green Hollow is an authorized representative and, upon information and belief, is either the manager or managing member of Defendant HNGH Turtle Creek, LLC.

7. Defendant HNGH Turtle Creek, LLC ("***HNGH***"), is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Fifth Avenue, New York, New York 10020. HNGH is an affiliate or subsidiary of Green Hollow, and as its name suggests (HNGH *Turtle Creek*, LLC), was formed specifically for the purpose of acquiring a participation interest in the Loan and Deed of Trust (defined below) made the basis of this lawsuit. Although the precise ownership structure of HNGH is currently unknown, Glasgow and Nambiar both personally participated in the creation of HNGH and negotiations with Madison to acquire this participation interest.

8. Defendant Vipin Nambiar ("***Nambiar***") is an individual citizen and resident of the State of Texas who resides in Dallas County, Texas. Nambiar is a managing partner of HN Capital Partners. Upon information and belief, Nambiar is also a principal, owner, or otherwise exercises control of HNGH and personally participated in the conduct forming the basis of this lawsuit. As described herein, Nambiar personally misappropriated Plaintiffs' federally protected trade secrets and conspired with others regarding the misappropriation and use of these trade secrets for his

economic gain.

9. Defendant James G. Glasgow, Jr. ("***Glasgow***") is an individual citizen and resident of the State of New York who resides in New York, New York. Glasgow is the Chief Executive Officer of Green Hollow. Glasgow previously invested in high-end hospitality projects along with Nambiar, and upon information and belief, entered into a joint venture or other combination of interests with Nambiar (or an affiliated entity) to form HNGH and personally participated in the conduct which forms the basis of this lawsuit. Specifically, for his own economic gain, Glasgow engaged in fraudulent conduct specifically aimed at real property in Texas knowing that conduct would cause harm to Barton, a Texas resident. As described herein, Glasgow personally misappropriated Plaintiffs' federally protected trade secrets and conspired with others regarding the misappropriation and use of these trade secrets for his economic gain.

10. Defendant Marc Zegen is an individual citizen of the State of New York who resides in New York, New York. Marc Zegen is an owner, director, and/or principal of Madison and personally participated in the conduct which forms the basis of this lawsuit. Specifically, for his own economic gain, Marc Zegen engaged in fraudulent conduct specifically aimed at real property in Texas knowing that conduct would cause harm to Barton, a Texas resident. As described herein, Marc Zegen personally misappropriated Plaintiffs' federally protected trade secrets and/or conspired with others regarding the misappropriation and use of these trade secrets for his economic gain.

11. Defendant Joshua (Josh) Zegen is an individual citizen of the State of New York who resides in New York, New York. Josh Zegen is an owner, director, or principal of Madison and personally participated in the conduct which forms the basis of this lawsuit. Specifically, for his own economic gain, Josh Zegen engaged in fraudulent conduct specifically aimed at real

property in Texas knowing that conduct would cause harm to Barton, a Texas resident. As described herein, Josh Zegen personally misappropriated Plaintiffs' federally protected trade secrets and/or conspired with others regarding the misappropriation and use of these trade secrets for his economic gain.

**C. <u>Non-Parties</u>**

12. William L. Hutchinson ("***Hutchinson***") is an individual citizen of the State of Texas and founder and president of Dunhill Partners, a competing real estate development company to Plaintiff Barton's company. Hutchinson is partners with HN Capital Partnersand/or Nambiar or other investors in HN Capital Partners, which, as stated above, partnered with Glasgow to form Green Hollow in August 2019. Hutchinson has previously developed high-end hospitality projects in conjunction with Green Hollow (or an affiliated entity) and Nambiar, such as the Virgin Hotel and the W Hotel in Dallas, Texas. Upon information and belief, Hutchinson entered into a joint venture or other combination of interests with Glasgow, Nambiar, Green Hollow and/or HNGH to misappropriate Plaintiffs' trade secrets and otherwise interfere with the Project made the basis of this lawsuit.

## III. <u>JURISDICTION AND VENUE</u>

13. The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of the United States.

14. The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15. The Court has specific personal jurisdiction over the nonresident Defendants, HNGH, Green Hollow, Turtle Creek, and Madison because they entered into negotiations for Madison and Turtle Creek's sale of a participation interest to Green Hollow and HNGH, which was memorialized by a subsequent letter of intent and agreement regarding real property located in Texas. Moreover, Turtle Creek has already availed itself of Texas law by attempting to foreclose on the Texas property and by bringing suit against Defendant Barton in Texas court.[1] Additionally, the Court has specific personal jurisdiction of nonresident Defendants Glasgow, Josh Zegen, and Marc Zegen because Defendants intentionally directed their tortious conduct toward the State of Texas, knowing that their conduct would cause harm to a Texas resident.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial portion of the events or omissions giving rise to the claims in this lawsuit occurred in this District.

## IV. FACTUAL BACKGROUND

### A. Development of Luxury Hotel Project

17. On or about September 16, 2019, 2999TC acquired property located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "***Land***") for the purpose of developing the Project, a luxury hotel and branded residence, which was already under contract to be managed by an international luxury hotel brand ("***International Hotel***"). As the Court may be aware, Turtle Creek is one of the most exclusive, high-wealth districts in Dallas with prime real estate but little space for additional development, increasing demand and cost accordingly. Plaintiff Barton had been working to acquire the Land since April 2018. He successfully obtained all zoning permits and entered into a Management Agreement with the hotel, personally investing millions of dollars prior

[1] *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, Cause No. DC-20-12133, in the 192nd Judicial District Court of Dallas County, Texas.

to the September 2019 closing on the Land.

18. As part of the closing on the acquisition of the Land, 2999TC executed a $32.5 million Secured Promissory Note ("***Loan***"), attached hereto as **Exhibit A**, and a Deed of Trust, Security Agreement, and Fixture Filing ("***Deed of Trust***") (collectively, "***Loan Documents***"), attached hereto as **Exhibit B**, for the benefit of Lender, a special purpose entity created by Madison solely for the Project. Both the Loan and Deed of Trust are secured by the Land.

19. The Loan was a 1-year note (with two six-month extensions) intended solely for the purchase of the Land, and which was to be repaid by subsequent investment for the entire Project, approximately $365 million in debt and equity—for which Madison held first right of refusal to be the construction lender for an estimated construction loan of approximately $250 million. Madison relied upon a broker's opinion to value the Land at approximately $50 million. At closing, Plaintiffs contributed $17.5 million in equity and have subsequently contributed an additional $3 million in equity toward the Project. 2999TC and Barton had leveraged substantially all of their available assets in order to contribute this equity, which they did in reliance upon representations by Madison, through its principals Josh and Marc Zegen, that Madison would assist in securing investors for the $100 million equity portion of the Project.

20. With the further understanding and expectation that Lender and Madison intended to carry out their duties under the Loan and Deed of Trust in good faith and in a commercially reasonable manner, Plaintiff Barton, as President of 2999TC, executed a Guaranty on the amounts due under the Loan and Deed of Trust (the "***Guaranty Agreement***").

21. However, upon information and belief, at the time 2999TC executed the Loan and Deed of Trust, Madison through Marc and Josh Zegen, and its special purpose entity, Lender,

intended to undermine 2999TC's Project, never intending to meaningfully assist with raising capital or see the Project through. Specifically, in order to make a quick return on its investment, Madison intended to sell a portion of the Loan (a "***B-Note***") to another real-estate developer and assigning the remainder to an outside bank, Axos Bank ("***Axos***"). Having a real-estate developer on the B-Note was critical to this arrangement because, in the event of default by 2999TC, this new developer could ensure that the Project was successful and that, therefore, Axos' third-party assignment would not be at risk. Madison never disclosed its true intentions for the Loan when negotiating the Land deal with Plaintiffs.

22. Typically, "B-Notes" or "junior subordinate interests" are used by lenders to spread out risk among other institutional investors (such as banks or real estate investment trusts), who then hold this junior subordinate participation interest as part of a larger investment portfolio for the duration of the loan in order to earn a return on their investment through the borrower's repayment of the original loan. Here however, the underlying note (the Loan), was merely a 1-year pre-development loan for the Land *only*, which was to be quickly repaid by subsequent investment and/or construction financing. In other words, this short-term note was not a good candidate for a typical B-note purchaser, suggesting that Madison had shrewder intentions for soliciting a B-note investor.

**B. Madison's Sham Investment Pitch**

23. Sometime before October 24, 2019, without Plaintiffs' knowledge, Josh Zegen communicated with Glasgow to discuss the Project. Green Hollow is a real estate investor whose founding members, such as HN Capital Partners already had extensive experience investing in the Dallas luxury hospitality space. On October 24, 2019 a meeting took place in New York City, wherein Josh Zegen and Marc Zegen expressly offered Glasgow and Green Hollow the opportunity

to purchase the B-Note on the Project, despite the fact that these parties were not the types of institutional investors contemplated under the Loan Documents as proper junior subordinate participants. *See* **Exhibit D**. At the time, Madison was aware that Glasgow and Green Hollow were already in partnership with Nambiar and that, collectively, they intended to find a backdoor method for Glasgow, Green Hollow, and Nambiar to acquire the Land and/or the Project. At all times during this meeting, Glasgow and the Zegens were aware that the B-Note purchase involved a loan on real property in Texas and that Glasgow and Nambiar's acquisition of the Land and/or the Project would harm Barton, a Texas resident. That same day, Glasgow memorialized the B-Note offer from this meeting by emailing Nambiar, a Texas resident, to discuss the offer. Glasgow's email to Nambiar showed that they were already working together, telling Nambiar that Josh Zegen was "offering us a B-Note." *See* **Exhibit D**.

24. About a week later, unaware of this meeting between Madison and Glasgow, Barton received a telephone call from Josh Zegen from Madison. Marc Zegen and Josh Zegen asked Barton to drop everything and come to New York to meet with Glasgow, whom they represented to be a "prospective equity investor" for the Project. Because finding equity investors was precisely what Madison had told Barton and 2999TC that it would do, Barton promptly agreed to come to New York and pitch this "prospective equity investor" on the Project and the $100 million equity raise they were seeking. Barton knew that Glasgow and Green Hollow were real estate investors but had no reason to believe that they were interested in competing with him to take over the Project.

25. On November 4, 2019, Barton met with Josh Zegen and Glasgow at Madison's office in New York City. Just as in his earlier telephone call, Josh introduced Glasgow as a potential equity investor. Although Glasgow had already been offered the B-Note on the loan two

weeks earlier, Glasgow did not disclose this to Barton. Instead, Glasgow silently permitted Barton to believe that Glasgow was indeed a "prospective equity investor" and present his pitch for the entire $100 million equity offering. Although Glasgow knew that Barton was under a false impression about the purpose of the meeting and Glasgow's intentions, Glasgow made no effort to correct this false impression. At all times, Glasgow was aware that Barton was a resident of Texas and that the Land and Project were located in Dallas County, Texas.

26. Barton knew that Glasgow was a real estate investor and believed him to be a viable candidate as a potential equity investor. As a result, however, before, during, and after the pitch, Barton made clear that the information being presented was confidential and not to be used to compete with the Project. Before the presentation, Glasgow verbally agreed to keep confidential all information disclosed at the meeting.

27. During the meeting, Barton disclosed information that he would never have disclosed to someone who intended to take over the Project, such as construction drawings, plans, contractor bids, the contract terms with the International Hotel, balance sheets, pro formas, projected returns., and most importantly, capital structure. In the competitive real-estate development industry, a developer's capital structure is highly confidential because it provides transparency into the developer's curated network of business contacts and investors, and the individual "deals" made with each, as well as the developer's cash position and relative level of liquidity, which competing developers could exploit to their advantage. As part of the capital structure for the overall project, a developer may make the strategic decision to take personal risk by borrowing money from this network of investors to make a down payment toward the land on which to develop a project. Especially when a developer is extensively leveraged, this capital structure is highly confidential because competing developers could use this information to

interfere with a project and create liquidity issues for the developer. For this reason, capital structure and strategy is shared only with those the developer believes to be sincere investors, as those investors would expect to know how their investment would be used. Based upon Barton's belief that Glasgow was a bona fide investor, Barton revealed information about this capital structure and strategy to Glasgow. Specifically, Barton disclosed that he had leveraged substantially "everything he owned" in order to purchase the Land and would be using part of the $100 million capital raise to recoup approximately $12 million of the funds he invested. Prior to this meeting, Barton had not previously disclosed this information to Madison or any other person, and only did so due to Glasgow's verbal confidentiality agreement and Barton's belief that disclosure would further the economic interests of the Project.

28. Barton initially believed the pitch to Glasgow had gone well. Glasgow seemed excited about the Project and, although he stated that he would not invest the full $100 million, Glasgow represented that he would invest $50 million in mezzanine funding. But this was a complete lie. During the meeting, neither Glasgow nor Madison informed Barton that Glasgow was not truly a prospective investor, but that he was rather considering purchasing the B-Note on the Loan in order to take control of the Land and/or the Project in Dallas.

29. Upon information and belief, Madison's true intention for setting this meeting was to provide Glasgow with confidential information about the Project and allow Glasgow to see for himself the real prospective "return" that the B-Note might offer, specifically, the full seizure of the Project. By discovering the extent of Barton's personal debt in the Project and his desire to de-leverage himself using the capital raise, Glasgow would have been able to identify the precise "pressure point" (i.e., liquidity problems) that he might be able to exploit using the B-Note—as long as the terms of the B-Note gave enough control to Glasgow, that is.

Case 21-03085-hdh Doc 1 Filed 12/08/21 Entered 12/08/21 10:54:14 Desc


**C. The "B-Note" Negotiations**

30. Shortly after this meeting, on November 15, 2019, Green Hollow and Madison executed a Letter of Intent for Green Hollow to purchase the B-Note in the amount of $7 million. *See* **Exhibit F**. Thereafter, from November 27 through December 10, 2019, Green Hollow, Madison, and their attorneys exchanged a series of emails negotiating the terms of the B-Note.

31. Nambiar was another party to these negotiation. For many years, Nambiar worked as managing director for Hunt Consolidated. In 2017, a Hunt Consolidated affiliate, Hunt Investment Group, and Nambiar formed HN Capital Partners. Nambiar is the managing director of HN Capital Partners, which operates with the financial backing of Hunt Investment Group. HN Capital Partners' primary activity was investing in the acquisition and development of hospitality-sector properties. For example, HN Capital Partners recently acquired the W Hotel in Dallas and may have been involved in the development of the Virgin Hotel in Dallas—both of which were properties developed by Plaintiffs' competitor, Dunhill Partners, which is owned by Hutchinson.

32. In August 2019, HN Capital Partners (and/or one of the related entities affiliated with Nambiar) entered into a joint-venture with Glasgow to form Green Hollow. Like HN Capital Partners, Five Mile Capital Partners specialized in investing in hospitality projects. As with Nambiar's other projects, Hunt Investment Group served as the financier and sponsor of Green Hollow. In September 2019, Green Hollow raised $42.5 million. This amount—not coincidentally—was substantially the same amount Barton and 2999TC sought to raise to develop the Project, suggesting that Glasgow and Nambiar had already set their sights on developing the Project before 2999TC even closed on the Land. Upon information and belief, Nambiar, Glasgow, Green Hollow, and/or one of their affiliated entities had even attempted to purchase the Land unsuccessfully, causing them to seek an alternative method for acquiring the Land.

33. Notably, the December 2019 emails among Glasgow, Nambiar, Madison, and their attorneys (which Plaintiffs obtained through discovery in other litigation) focused extensively on the prospect of foreclosure of the Project in the event of a monetary or non-monetary breach by 2999TC, which would give full control of the Project to Glasgow and Nambiar (and the entity they would be forming to purchase the B-Note) in the event of such a default. *See* **Exhibit G**. The emails even including carrying costs and lease up analysis, which would only be relevant *after* a foreclosure. Plainly, in discussing the prospect of foreclosing on a piece of land in Texas, Glasgow, Green Hollow, Nambiar, and HNGH intended to avail themselves of Texas law in order to effectuate this hostile takeover. Shockingly, Madison even agreed to finance HNGH's acquisition of the Land for HNGH to obtain control of the Project and potentially finance construction. Notably, all of this discussion of foreclosure occurred months before the first alleged "default" event.

34. On December 16, 2019, Green Hollow, Glasgow, Nambiar (and/or their affiliated entities) formed HNGH to be the special purpose entity to be the junior participant in this B-Note purchase. Although the parties had originally expressed an interest in closing before the 2019 year-end, upon information and belief, Nambiar still wanted to learn more about the Project himself before finalizing the purchase of the B-Note.

**D. Nambiar's Sham Investment Meeting with Barton**

35. Throughout the fall of 2019, Barton remained unaware that Madison, Glasgow, and Nambiar were conspiring with regard to the B-Note sale and purchase. Although Glasgow promised to be in touch after their November 2019 meeting in New York, Barton never received any further communications from Glasgow regarding the $50 million in mezzanine funding that Glasgow said he was considering. Assuming that Glasgow was no longer interested in investing,

Barton continued to solicit other sources of investment for the Project.

36. Through mutual contacts, Barton was introduced to Nambiar as a potential investor. On January 2, 2020, Barton and Nambiar communicated by email to schedule a meeting to discuss the Project. Nambiar did not disclose that was a partner with Glasgow and Green Hollow and was already involved in negotiations concerning the Project, nor that they had formed HNGH specifically for the purpose of purchasing the B-Note on the Loan. Instead, Nambiar represented that he was interested in becoming an investor—even warning Barton: "I don't run a passive LP [limited partner] program." Which, to an experienced developer means: "If I invest in your project, I am going to want run this project like a partner alongside you." *See* **Exhibit H**. Thus, Barton understood that the purpose of the meeting was to pitch Nambiar on becoming an equity investor.

37. Nambiar and Barton met on January 16, 2020, to discuss Nambiar's potential investment in the Project. As part of that meeting, Barton again shared confidential and proprietary information with Nambiar, including but not limited to the financial projections for the Project, details of the contractual terms with the International Hotel, the identities of certain investors, and the capital structure for the Project, including the total amount of capital 2999TC intended to raise, the identity of Lender, the amounts of capital Lender and Madison expected to contribute to the Project, and the amount of debt Barton obligated himself to acquire the Land. Upon hearing the confidential plans, Nambiar expressed interest about investing in the Project. At no time during the meeting did Nambiar disclose his relationship with Glasgow or Green Hollow, or that he was already in negotiations to purchase the B-Note from Madison.

38. Before, during, and after the meeting, Barton informed Nambiar that the information about the Project was confidential and proprietary. Before the presentation, Nambiar agreed to keep the information confidential and not to use any information to compete with the

Project. Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential and Barton's belief that disclosing the information would further the Project's economic interests. He certainly would not have disclosed all of this confidential information had he known about Nambiar's affiliation with Glasgow or HNGH, their intention to purchase the B-Note, or their plans to seize the Project.

39. Following the January 16, 2020, meeting, Barton reached out to Nambiar multiple times but received no response.

**E. The Secret Participation Agreement**

40. Apparently having received the information Nambiar was looking for, approximately one week after his meeting with Barton, on January 24, 2020, Madison, through Lender, closed on the purchase of the B-Note (hereafter referred to as the "***Participation Agreement***" and attached hereto as **Exhibit C**, filed under seal) with Glasgow and Nambiar's company, which is HNGH.

41. Thus, instead of receiving word from Nambiar about his investment in the Project, Plaintiffs received notice from the Lender, which stated that it had sold a "junior participation interest" to HNGH in the amount of $7 million. Glasgow and Nambiar's involvement continued to remain unknown to Plaintiffs. Under the terms of the Deed of Trust, Lender was permitted to enter into these agreements with <u>specific</u> types of investors, such as banks, insurance companies, trusts, and other types of traditional institutional lenders. At the time, Plaintiffs were not immediately concerned about the Participation Agreement because, (i) it is not uncommon for other lenders to participate in such loans even if such involvement occurs at the beginning; (ii) they had no knowledge of Glasgow or Nambiar's role in HNGH; and(iii) the notice from Lender clearly stated that "*Borrower shall continue to coordinate* ***directly with Lender*** *in accordance with*

*the loan Documents with respect to servicing and administration of the Loan*." Thus, Plaintiffs presumed that, for whatever reason, Lender had simply sold part of its interest to a passive institutional lender.

42. Under the terms of the Participation Agreement (which Lender and HNGH refused to provide until May of 2020 after Plaintiffs filed suit seeking an emergency order compelling production), Lender assigned away significant rights pertaining to the Loan and Deed of Trust. For instance, in the event of a default, HNGH was permitted to voluntarily cure the default by making payment to Lender for the benefit of 2999TC in order to secure its right to borrow funds from Madison to acquire the Land after a foreclosure. If HNGH elected to cure a default, then Lender would cede all control of the administration of the Loan to HNGH, and HNGH would become the "Lender" for purposes of the Loan, Deed of Trust, and Guaranty Agreement. Subject to this "cure" by HNGH, not only would HNGH have the exclusive right to communicate with Plaintiffs about these contracts, but had to approve the sale of any interests related to the Loan or workouts with 2999TC and would also have the *exclusive right* to foreclose on the Land. Lender was also prohibited from transferring any portion of the Loan to any affiliated entity, or from selling its interest to any party affiliated with Lender or any party who would be adverse to HNGH, an anti-competitive provision that completely eliminated any possibility for certain types note sales by Lender to third-party purchasers. Reputable lenders in the financial world would never have agreed to the onerous provisions contained in the Participation Agreement, deeply favoring the participant, unless they had previously devised a scheme with the participant or other parties to the detriment of the borrower. None of these terms concerning the sale/transfer of the Loan were known to or agreed upon by Plaintiffs.

43. Plus, in a highly unusual twist on typical b-note participation agreements, Lender

and Madison agreed that their parent investment fund, Madison Realty Capital Debt Fund IV, LP, would *fully indemnify* HNGH for any liability arising as a result of its actions in conjunction with any cure payment, exercise of remedies, or election to foreclose on the Land—suggesting that HNGH, Lender, and Madison were already well aware that the Participation Agreement would likely exceed the boundaries of good-faith contractual conduct and make HNGH susceptible to legal action if the scheme backfired.

44. Notably, as part of the same transaction, Madison, through Lender, sold the balance of its interest in the Loan to Axos in a Repurchase Loan Agreement. As a result, Madison successfully hypothecated the entire value of the Loan and no longer had any money or meaningful risk in the Project, thereby stripping any remaining incentive to secure investment for the Project as Madison, through Marc and Josh Zegen, had originally represented.

**F. The Plan to Acquire the Land**

45. As stated, the terms of the Participation Agreement revealed that HNGH was clearly being positioned to take control of the Project. Toward that end, HNGH needed to make sure that default actually occurred.

46. Glasgow and Nambiar were well placed to create this takeover plan after having acquired Plaintiffs' confidential information from their meetings with Barton. Specifically, knowing that Barton had already gone into significant debt to acquire the Land, Defendants knew 2999TC was running on a thin margin of liquidity. Thus, by artificially creating additional cash-flow problems, a default became more likely. Toward that end, Defendants devised a plan specifically calculated to eliminate investors, deplete 2999TC's funds, and exploit the hardships that would naturally follow.

47. The first step was to scare away investors and ensure that 2999TC would not have

funds to pay its obligations. Accordingly, after entering into the Participation Agreement, Nambiar contacted other potential investors in the Project, telling them he "owned" the Loan on the Project, persuading Plaintiffs' two committed investors to back out. Specifically, Barton had previously met with other potential investors for the Project, including a foreign investor from Korea, Aju Hotels and Resorts, and Daniel Minkowitz of Mink Development (the "***Investors***"), both of whom had negotiated and finalized formal agreements to invest in the Project. Upon information and belief, Nambiar had these discussions with the Investors on one or more occasions, including a meeting at the Virgin Hotel on or around March 4, 2020, and further, that he communicated with the Investors via telephone, text message, or email on one or more occasions. In the real-estate-development industry, Nambiar's statement that he "owned" the Loan would be a signal of trouble for investors and is a way of suggesting to investors that they should invest their money elsewhere. Shortly thereafter, *both* of the Investors backed out of the Project.

**G. The Scheme to Manufacture Defaults**

48. Having deprived the Project of its Investors, Defendants then waited for an "opportunistic" moment to trigger default. Under the Deed of Trust, 2999TC is required to pay the property taxes that accrued on the Project. On January 31, 2020, the Dallas County property taxes became due. In the normal course of business, 2999TC immediately began discussions with the Dallas County tax assessor to extend the due date of the 2019 taxes, and enter into a payment structure, a very common practice in the real estate development industry due to the favorable interest rates offered by the County. In the midst of restructuring this tax payment, the world was introduced to the novel coronavirus ("***COVID-19***"), which quickly halted the negotiation process with Dallas County as the State of Texas and its municipalities entered various emergency orders shutting down everything but "essential businesses," which the county tax assessor's office was

not considered to be.

49. As a result of the unprecedented governmental orders arising from the COVID-19 pandemic, in February 2020, capital and lending markets across the United States crashed causing increased financial pressure on Plaintiffs, along with millions of other businesses during this period. The letter and spirit of federal and state orders being issued during this period and the months following contained mandates of cooperation, grace periods, forbearance, and other critical assistance to borrowers during this time period.

50. 2999TC had already informed Lender of the anticipated tax payment plan, to which Lender did not object and made no mention of default under the Deed of Trust. Believing Lender intended to cooperate in good faith, in accordance with the current economic conditions, and in furtherance of the continued commercial viability of the Project, on March 27, 2020, 2999TC contacted Lender seeking a temporary forbearance agreement regarding its payment obligations under the Loan and Deed of Trust. Instead of receiving a reply to its request for forbearance, Plaintiffs received a confusing telephone call from someone calling on behalf of *HNGH* making demand for the tax payment. Because Plaintiffs had been instructed that Lender/Madison was still the sole point of contact for the Loan administration, Plaintiffs refused to speak with this unknown caller and insisted that they would deal only with Madison.

51. Then, on April 6, 2020, 2999TC received a demand letter from HNGH's counsel via certified mail through the US Postal Service. Again, Plaintiffs did not yet know about HNGH's connection with Nambiar, Green Hollow, or Glasgow. HNGH claimed that it was exercising certain rights under the Participation Agreement—which 2999TC had never seen and to which it was not a party—and that *HNGH* would be paying the 2019 taxes itself as a protective "Tax Advance," and thereafter proceeded to make a formal demand for immediate payment of the taxes

($345,907.84). Plaintiffs were surprised by this demand because, not only did 2999TC have no privity with HNGH, but again, it had been instructed that *Lender* was the only party with whom 2999TC was allowed to interact with respect to the servicing and administration of the Loan. HNGH further demanded that 2999TC pay default interest (as stated in the Deed of Trust) on the tax payment and threatened to begin "foreclosure proceedings" if payment was not received within *four days*.

52. Notwithstanding Lender's prior representation that 2999TC would continue to communicate with Lender regarding the Loan, and that HNGH was merely the "junior participant" under the Participation Agreement, HNGH established itself as a gatekeeper of sorts between 2999TC and Lender. By letter dated April 9, 2020, HNGH identified itself as the "Lender" and Turtle Creek as the "Senior Participant" and insisted that 2999TC enter into an onerous "pre-negotiation agreement" directly with HNGH as a prerequisite to negotiating any tax forbearance with Lender. Among its numerous unilateral terms, this "pre-negotiation agreement" asked Plaintiffs to waive *all claims* it might have against Lender and HNGH and affirm the validity of the secret and unseen Participation Agreement. For example:

> Borrower and Guarantor acknowledge that they have received written notice of Lender's junior participation in the Loan ***and agree that no discussions between Lender and Senior Participant can be used in a court of law as a claim of wrongdoing and acknowledges that each of Senior Participant and Lender have the right to have discussions and agreements concerning the Borrower and the Property***.
>
> Borrower and Guarantor acknowledge and agree that continuing throughout the pendency of the Discussions, ***Lender shall have the right, in its sole discretion pursuant to the terms of the Participation Agreement***, to administer, enforce, and otherwise deal with the Loan, the Loan Documents, and the Default Correspondence, notwithstanding the Discussions, and notwithstanding the fact that there exist Defaults under the Loan as more fully described in the Default Correspondence.
>
> By entering into the Discussions, Lender is making no promise or commitment to

> do anything or to refrain from exercising any or all available remedies under the Loan or the Default Correspondence, and ***Borrower and Guarantor may not rely on the Discussions continuing nor may they rely on the Discussions resulting in any outcome to restructure, forebear, or modify the obligations of the Borrower or Guarantor under the Loan Documents. . .***
>
> * * *
>
> ***Borrower and Guarantor represent and warrant to Lender that neither of them have any claim or cause of action of any kind with respect to the Loan Documents or Obligations thereunder against Senior Participant or Lender***.

53. Plaintiffs refused to enter into this coercive agreement. Troubled by HNGH's escalating demands, in letters dated April 10 and 13, 2020, Plaintiffs again reached out directly to Lender in an attempt to gain transparency into the Participation Agreement and understand why this stranger to the Loan and Deed of Trust was attempting to impose new requirements. Plaintiffs' letters again emphasized the extensive business disruptions caused by the COVID-19 shutdown orders, including Dallas County's Shelter in Place: Safer at Home Order and Governor Greg Abbot's Executive Order GA-14, and contained renewed requests for a temporary forbearance of any payment obligations under the Loan and Deed of Trust. In response, Plaintiffs received a Notice of Default from Lender on April 30, 2020, via certified mail, asserting the tax payment as a basis for default—even though the 2019 taxes had already been paid by HNGH and thus the Land was never at risk of any encumbrance whatsoever.

54. On May 5, 2020, Lender finally responded directly to Plaintiffs' requests for forbearance. Although Lender seemed willing to negotiate, the letter made clear that, through the Participation Agreement, it had already assigned certain rights to HNGH to act on Lender's behalf and that it had authorized the tax payment by HNGH and that it simply would not proceed with any discussions of forbearance without the execution of the "pre-negotiation agreement." Although Plaintiffs initially believed that HNGH's "participation interest" simply entitled it to

payment of returns on its investment, Lender's letter made it clear that it had assigned substantive rights to HNGH that materially affected Plaintiffs' rights provided in the Loan and Deed of Trust. But 2999TC never consented to the Lender assigning enforcement or foreclosure rights to HNGH, which is required under the terms of the Loan and/or Deed of Trust. At all times, Plaintiffs have continued to dispute the alleged default under the Loan or Deed of Trust.

55. Upon information and belief, Lender and Madison refused to negotiate a forbearance with 2999TC simply because they did not want to disclose the Participation Agreement and reveal the extent of control they had already ceded to HNGH without Plaintiffs' consent—the obvious reason being that they wanted Plaintiffs to execute the "pre-negotiation contract" to sanitize Lender's intentional breach of contract. Upon further information and belief, Lender and HNGH insisted upon the "pre-negotiation agreement" because Lender and Madison were already well aware that HNGH was a competitor to Plaintiffs and was preparing to seize control of the Project with Lender and Madison's encouragement and assistance.

**H. Lender's Further Efforts to Trigger Default, Obtain Trade Secrets, and Harass Plaintiffs**

56. After Plaintiffs' refusal to execute the "pre-negotiation agreement," Lender's behavior became more erratic and harassing as it continued to look for default events in order to benefit its co-conspirator HNGH. First, Lender sent a letter via certified mail that 2999TC's interest reserve account was depleted and needed to be refreshed, which was a misrepresentation of the state of the reserve account. In fact, because the interest reserve account was not depleted and did not need to be refreshed, 2999TC disputed this demand and asked for an accounting, which Lender never provided. Instead, Lender simply provided another certified letter—a contrived Notice of Default now alleging an "Interest Reserve Default" under the Loan.

57. 2999TC provided its own spreadsheet of transactions from the interest reserve

account, the dates the account had been funded, the expectation for its depletion, and anticipated future date for refunding. 2999TC again asked for an accounting from Lender with its own accounting in order to clear up the discrepancy, which Lender again failed to provide. Rather than providing any response, on June 9, 2020, Lender again sent a certified letter alleging a "Tax Payment Default" and an "Interest Reserve Default" under the Loan. 2999TC again disputed the interest reserve default by letter dated June 16, 2020—now its third request for an accounting—which Lender again refused to provide.

58. Along with months of stonewalling Plaintiffs' requests for information, Lender has continued to engage in conduct calculated to harass and intimidate Plaintiffs. For example, on Friday, July 17, 2020, close to 10:00 p.m. CST, counsel for Lender emailed Plaintiffs' counsel alleging that "someone is removing certain property and fixtures from the [Project]." Lender further alleged that "valuable artwork and other collateral securing 2999TC's loan" was being removed and that 2999 Acquisitions had "absconded with a valuable statue which was a fixture at the property." Further, Lender alleged that because 2999TC was "purposefully and maliciously depleting the collateral securing its outstanding debt in what can only be characterized as an act of desperation," it would contact the police if the items were not returned. However, at all times, Lender was well aware that the artwork and sculpture were not its collateral. Its harassment and threats of police intervention are nothing more than additional evidence of its bad faith in dealing with 2999TC.

59. At one point, Plaintiff Barton received a disturbing call from his construction company on the Project. Apparently, Hutchinson (a known associate of Glasgow and Nambiar, who, as stated above, had collectively developed projects in the past) had placed a telephone call to the construction company pretending to be an interested tenant in an attempt to obtain

construction plans and other confidential information about the Project. Upon information and belief, Hutchinson did this with the knowledge, approval, assistance, and/or encouragement of Nambiar, Glasgow, Green Hollow, and/or HNGH in order to assist them in their scheme to misappropriating trade secrets and take over the Project with the understanding that Hutchinson's company, Dunhill, would be their chosen developer.

60. Eventually, based on the unsubstantiated claims of default, Lender attempted to foreclose on the Land in early August, which was prevented by an emergency temporary restraining order. As part of this proceeding, Plaintiffs were finally able to compel a copy of the Participation Agreement, which confirmed what Plaintiffs had already come to suspect about the relationship between Madison, Lender, and HNGH. Specifically, the Participation Agreement does not simply provide HNGH with the right to certain proceeds or profits of the Loan; on the contrary, it provides HNGH with the right to control Lender with regard to the Deed of Trust, including the exclusive right to foreclose on the Land, along with many other restrictions on Lender that are highly unusual in the secondary-lending market The Participation Agreement also provided HNGH with the right to enter into modifications and forbearance agreements with 2999TC and to make advances for tax obligations under the Deed of Trust.

61. Because all of this was kept hidden from Plaintiffs, they were unable to timely negotiate a forbearance on the Loan. More specifically, when Lender transferred fundamental rights provided in the Deed of Trust without the knowledge or consent of 2999TC, Plaintiffs were impeded from timely communicating with its "lender"—or even truly knowing the identity of its "lender." Remarkably, it was not until bringing suit to enjoin the foreclosure on the Land that Plaintiffs finally discovered that Glasgow and Nambiar had been behind HNGH all along.

## I. The Scheme Culminates with Complete Assignment to HNGH and a Final Foreclosure Attempts

62. On November 20, 2020, Lender again filed a notice of foreclosure against 2999TC with the sale set to occur on January 5, 2021. Plaintiffs did not become aware of the posting until December 2, 2020. Meanwhile, unbeknownst to Plaintiffs, Lender sold and assigned the entirety of the Loan to HNGH on December 7, 2020 ("***Assignment***")—*after* filing for foreclosure. Plaintiffs learned about the Assignment on December 16, 2020. As an additional oddity, HNGH (Nambiar) received funding from Happy State Bank, indicating Nambiar did not disclose this litigation because reasonable and unbiased banks do not lend money on a loan *allegedly in default*, and somehow HNGH collaterally assigned and transferred the Loan and related deed of trust to Happy State Bank on December 4, 2020—*before* Turtle Creek assigned the Loan to HNGH.

63. As a result of this 100% Assignment to Plaintiffs' competitor, Plaintiffs' Loan no longer resembles the agreement Plaintiffs entered into with Madison and Turtle Creek. Instead, Plaintiffs are entirely at the mercy of HNGH, a party whose sole interest is to oust Plaintiffs' from all interest in the Land and the Project and obtain the Land for itself.

64. HNGH sent an amended notice of foreclosure, which was not actually received until December 23, 2020. Apparently HNGH stamped the notice using a private postage meter on December 11, 2020, but did not actually deposit the notice in the U.S. mail until December 15, 2020 which was not timely for the foreclosure set for January 5, 2021.

65. Plaintiffs bring this action to enforce their rights under the Loan and Deed of Trust, seek damages for the unreasonable delay and bad faith exhibited by Lender and Madison (by and through Marc Zegen and Josh Zegen), and to hold their conspirators (Glasgow, Nambiar, Green Hollow, and HNGH) accountable for the misappropriation of trade secrets, fraud, and tortious interference that have frustrated the business purpose of the Loan and Deed of Trust and caused injury to Plaintiffs.

## V. CLAIMS FOR RELIEF

### A. <u>Count 1: Misappropriation of Trade Secrets Under the Defense of Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) (Against All Defendants)</u>

66. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

67. Plaintiffs 2999TC and Barton are the owners of trade secrets related to the Project, including but not limited to, financial projections for the Project, the total amount of capital Plaintiffs intended to raise, the amount of capital Lender and Madison expected to contribute to the Project, the amount of debt the Project would incur and which Plaintiffs had already incurred, including and especially the capital structure for the Project, including the amount Plaintiff Barton had personally leveraged, the identity of the Project's Investors, contractor bids, the terms of the International Hotel contract, and designs and plans for the entire development ("***Trade Secrets***").

68. These Trade Secrets are related to the Project, which will provide products and services (luxury hotel accommodations) that are intended for use in interstate and/or foreign commerce.

69. As described herein, these Trade Secrets have independent economic value from not being generally known or readily ascertainable through proper means by another person who could obtain economic value from disclosure or use of the information.

70. Plaintiffs have made and continue to make reasonable efforts to maintain the secrecy of their Trade Secrets by refusing to provide this information to any third parties who were not bona fide prospective investors.

71. Upon information and belief, Nambiar and Glasgow, acting individually and on behalf of Green Hollow and HNGH, intentionally and maliciously obtained Plaintiffs' Trade Secrets and confidential information, used the information to obtain a participation interest in the

Loan, and proceeded to wrongfully compete with Plaintiffs by causing the Investors to back out of the Project and taking other actions to sabotage the Project by manufacturing defaults in the midst of a global pandemic in order to foreclose on the Land and take control of the Project. Glasgow and Nambiar were under a duty not to disclose the information Barton provided to them pursuant to an oral agreement not to disclose, and not to use the information to compete or otherwise injure Plaintiffs.

72. Upon further information and belief, Defendants Lender, Madison, Marc Zegen, and Josh Zegen intentionally and maliciously disclosed Plaintiffs' Trade Secrets and confidential information related to the Project to HNGH, Nambiar, Green Hollow, and Glasgow. Defendants Lender, Madison, Marc Zegen, and Josh Zegen were under a duty not to disclose pursuant to the covenant of good faith and fair dealing with Plaintiffs and the duty to refrain from interfering with or frustrating the business purpose of the Loan and Deed of Trust.

73. Defendants Lender, Madison, HNGH, Green Hollow, Nambiar, Glasgow, Marc Zegen and Josh Zegen have actually misappropriated the Trade Secrets without the express or implied consent of Plaintiffs to use, have access to, communicate, transmit, or disclose the Trade Secrets.

74. Plaintiffs seek recovery of actual loss caused by the misappropriation in an amount to be determined at trial, and for the unjust enrichment to Defendants in an amount to be determined at trial. In addition, pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D), because the Trade Secrets were willfully and maliciously misappropriated, Plaintiffs seek exemplary damages of not more than two times the amount of Plaintiffs' actual loss as determined by the jury and recovery of attorney fees.

**B. <u>Count 2: Breach of Covenant of Good Faith and Fair Dealing (Against Lender and Madison)</u>**

75. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

76. On or about September 20, 2019, 2999TC and Lender executed a valid and enforceable written contract.

77. The Loan Documents are governed by New York law. The implied covenant of good faith and fair dealing is required in the course of the performance of all contracts under New York law. A breach of this implied duty occurs when a party's conduct frustrates the purpose of the contract, injures the other party's right to receive the fruits of the contract, or evades the spirit of the bargain.

78. As described herein, Lender and Madison have engaged in conduct calculated to frustrate the purpose of the contract and plainly evade the spirit of the bargain, the effects of which were only exacerbated by the ubiquitous shutdown and shelter-in-place orders that followed the arrival of COVID-19. Specifically, by entering into the Participation Agreement with HNGH, a party they knew intended to compete against Borrower, Lender knowingly assigned critical rights regarding enforcement of the terms of the Deed of Trust including foreclosure to an entity whose primary economic interest is to see the contract fail, default triggered, and the Project foreclosed upon. In furtherance of this wrongful partnership with HNGH, Lender engaged in extensive bad-faith conduct, such as refusing to negotiate forbearance during the COVID-19 shutdowns, declaring defaults where none existed, refusing to respond to demands for information and accounting, using harassment to intimidate and coerce Plaintiffs into an onerous contract modification, and wrongfully attempting to foreclose on the Land following numerous manufactured breaches. Moreover, Borrower even attempted to bring other substitute lenders to the table to buy out the Loan and escape the onerous provisions that the Participation Agreement

had created. Lender and Madison refused to negotiate with these new investors because they had completely assigned these rights to HNGH and had agreed not to sell the balance of the Loan to any party who might be a competitor with HNGH—thus foreclosing on the substitute investors Borrower attempted to bring to the table.

79. Finally, in consummation of the scheme they intended from the beginning, on December 8, 2020, Lender assigned *all* of its remaining interest in the Loan to HNGH, thus placing Plaintiffs entirely at the mercy of its competitor who has no interest in negotiating or acting as a good-faith lender, but whose sole goal is to acquire the Land for itself through foreclosure.

80. Plaintiffs seek compensatory damages in an amount to be proven at trial due to the unreasonable delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project, along with Plaintiffs' reasonable attorney fees incurred in pursuing this action.

### C. Count 3: Breach of Deed of Trust (Against Lender)

81. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

82. In the alternative to Plaintiffs' claim for breach of covenant of good faith and fair dealing, Plaintiffs bring this claim for breach of the Deed of Trust against Lender.

83. On or about September 16, 2019, 2999TC and Lender executed a valid and enforceable written contract.

84. Section 40 of the Deed of Trust governs Lender's ability to assign or sell participation interests in the Deed of Trust to a variety of possible investors clearly contemplated under the agreement as institutional real-estate investors. This section also makes clear that, in splitting Lender's interest by selling a subordinate interest in the Loan, the Lender is prohibited from modifying or amending any material economic term of the Loan or materially increasing the

obligations or decreasing the rights of 2999TC under the Loan.

85. Lender's sale of the B-Note and entry into the Participation Agreement with a party who intended to compete with 2999TC was a breach of this provision. First, HNGH is not the type of permitted lender enumerated or contemplated under Section 40. Again, participation interests are sold to other lenders or investors who intend to hold the note for the purpose of receiving interest and principal payments over time—parties who want to see the borrower *succeed*, not rooting for the borrower's default. Second, the terms of the Participation Agreement did materially alter the terms of the Loan and Deed of Trust by assigning key rights of communication and enforcement to HNGH without permission, or even notification, to 2999TC, and stripping other key borrowers' rights inherent in every lending transaction, thereby causing injury to 2999TC.

86. Plaintiff 2999TC seeks compensatory damages in an amount to be proven at trial due to the unreasonable delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project, along with Plaintiffs' reasonable attorney fees incurred in pursuing this action.

**D. <u>Count 4: Fraud (Against Nambiar, Glasgow, Green Hollow, and HNGH)</u>**

87. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

88. Nambiar and Glasgow, as individuals and as agents of HNGH and Green Hollow, made false representations to Plaintiffs Barton and 2999TC. Specifically, at the meeting on November 4, 2019, Glasgow, acting individually and on behalf of Green Hollow, falsely represented that he was considering becoming an equity investor in the Project, agreed to use the confidential information provided by Barton for the purpose of considering such investment, and agreed to keep confidential such information regarding the Project that was provided by Barton.

89. Likewise, at the meeting on January 16, 2020, Nambiar, acting individually and on

behalf of HNGH, falsely represented that he was considering becoming an equity investor in the Project, agreed to use the confidential information provided by Barton for the purpose of considering such investment, and agreed to keep confidential such information regarding the Project that was provided by Barton.

90. Nambiar and Glasgow, as acting individually and as agents of HNGH and Green Hollow, made these statements to induce Barton and 2999TC to share confidential information regarding the Project. Barton justifiably relied on such misrepresentations by sharing the confidential information with Nambiar and Glasgow, and Plaintiffs suffered damages as a result.

91. Plaintiffs seek compensatory damages in an amount to be proven at trial due to the loss of investment, unreasonable interference, and delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project. Further, because Nambiar, Glasgow, Green Hollow, and HNGH's conduct was both willful and malicious, Plaintiffs are entitled to recovery of punitive damages.

**E. <u>Count 5: Fraud (Against Lender, Madison, Marc Zegen, and Josh Zegen)</u>**

92. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

93. Lender, Madison, Marc Zegen, and Josh Zegen falsely represented to Plaintiffs that they would obtain equity investors for the Project for the purpose of inducing Plaintiffs to purchase the Land. Instead, Lender, Madison, Marc Zegen, and Josh Zegen shared Plaintiffs' Trade Secrets and confidential information with parties who intended to compete with Plaintiffs, which Madison, Marc Zegen, and Josh Zegen fully understood, and/or lied to Plaintiffs to induce Plaintiffs to share confidential information about the Project, for the purpose of selling a participation interest in the Loan. Specifically, Marc Zegen and Josh Zegen represented that Glasgow was a prospective equity investor, and acting in reliance upon this representation, Barton disclosed confidential

information to Madison and Glasgow that would not have been shared but for this representation.

94. Following the Participation Agreement, Lender and Madison made false representations to Plaintiffs. Namely, that they were the holder and servicer of the Loan and had the right to control the same, even though the Participation Agreement transferred most of Lender's rights under the Loan and Deed of Trust to HNGH.

95. Lender and Madison made these statements to prevent Plaintiffs from negotiating a forbearance agreement or otherwise renegotiating the terms of the Loan.

96. Plaintiffs justifiably relied on such misrepresentations by continuing to attempt to negotiate with Lender and Madison, even though they seemingly had no right to amend the Loan.

97. Plaintiffs seeks compensatory damages in an amount to be proven at trial due to the unreasonable interference and delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project. Further, because the conduct of Lender and Madison was both willful and malicious, Plaintiffs are entitled to recovery of punitive damages.

### F. <u>Count 6: Fraud by Nondisclosure (Against Glasgow, Green Hollow, Nambiar and HNGH)</u>

98. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

99. Glasgow, Green Hollow, Nambiar and HNGH concealed or failed to disclose facts from Plaintiffs. Specifically, Glasgow and Nambiar, acting individually and on behalf of Green Hollow and HNGH, sought confidential and secret information from Plaintiffs while concealing that they intended to form, or had already formed, HNGH for the purpose of orchestrating a scheme to take control of the Loan and wrongfully foreclose on the Project. At all times during the meeting on November 4, 2019, Glasgow, acting individually and on behalf of Green Hollow, knew that

Barton was under the false impression that Glasgow was a prospective equity investor in the Project and silently permitted Barton to make his pitch and share confidential information, which Glasgow and Green Hollow used to Plaintiffs' detriment by causing HNGH to enter into the Participation Agreement on the Loan.

100. Likewise, at the meeting on January 16, 2020, Nambiar, acting individually and on behalf of HNGH, knew that Barton was under the false impression that Nambiar was a prospective equity investor in the Project and silently permitted Barton to make his pitch and share confidential information, which Nambiar and HNGH used to Plaintiffs' detriment by causing HNGH to enter into the Participation Agreement on the Loan.

101. Having previously made representations that caused Barton to believe that Glasgow and Nambiar were prospective equity investors, and knowing that Barton was under the false impression that they were prospective equity investors, Glasgow and Nambiar had a duty to disclose the whole truth

102.

103. Glasgow and Nambiar, individually and on behalf of Green Hollow and HNGH, knew that Plaintiffs were ignorant of these facts and did not have an equal opportunity to discover these facts.

104. Glasgow and Nambiar, individually and on behalf of Green Hollow and HNGH, were deliberately silent when they had a duty to inform Plaintiffs that they intended to purchase the B-Note and enter into the Participation Agreement for the purpose of orchestrating a scheme to wrongfully foreclose on the Project.

105. By failing to disclose this information, Glasgow and Nambiar, individually and on behalf of Green Hollow and HNGH, intended to, and did induce Barton and 2999TC to disclose

confidential information and Trade Secrets, which Plaintiffs relied upon and suffered injury as a result.

106. Plaintiffs seeks compensatory damages in an amount to be proven at trial due to the loss of investment, unreasonable interference, and delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project. Further, because the conduct of HNGH, Green Hollow, Nambiar, and Glasgow was willful and malicious, Plaintiffs are entitled to recovery of punitive damages.

**G. <u>Count 7: Fraud by Nondisclosure (Against Lender, Madison, Marc Zegen, and Josh Zegen)</u>**

107. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

108. Lender, Madison, Marc Zegen, and Josh Zegen concealed or failed to disclose facts to Plaintiffs. Specifically, Marc and Josh Zegen, individually and on behalf of Lender and Madison, failed to disclose their true intent to sell the B-Note to Glasgow when they induced Plaintiff Barton to attend a meeting with Defendant Glasgow, introducing him only as a potential equity investor.

109. Marc and Josh Zegen, individually and on behalf of Lender and Madison, had a duty to disclose these facts to Plaintiffs because, knowing that Plaintiffs believed Glasgow to be nothing other than an interested prospective investor, they owed a duty of good faith and fair dealing to be honest in their representations and disclose that he was not actually a prospective equity investor for the Project.

110. Marc and Josh Zegen, individually and on behalf of Lender and Madison, knew that Plaintiffs were ignorant of these facts and did not have an equal opportunity to discover these facts.

111. Marc and Josh Zegen, individually and on behalf of Lender and Madison, were deliberately silent when they had a duty to inform Plaintiffs that they intended to sell the B-Note to Glasgow and his affiliates.

112. By failing to disclose this information, Marc and Josh Zegen, individually and on behalf of Lender and Madison, intended to, and did induce Barton and 2999TC to disclose confidential information and Trade Secret, which Plaintiffs relied upon and suffered injury as a result.

113. Plaintiffs seek compensatory damages in an amount to be proven at trial due to the loss of investment, unreasonable interference, and delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project. Further, because the conduct of Lender, Madison, Marc Zegen, and Josh Zegen was willful and malicious, Plaintiffs are entitled to recovery of punitive damages.

**H. <u>Count 8: Conspiracy (Against All Defendants)</u>**

114. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

115. Each Defendant was a member of a combination or conspiracy involving two or more persons.

116. As described herein, Defendants' efforts to surreptitiously acquire Plaintiffs' confidential information and Trade Secrets were not done in isolation but were part of a long-term scheme devised by Lender, Madison, Marc Zegen, and Josh Zegen to enter into a Participation Agreement whereby Nambiar, Glasgow, HNGH, and Green Hollow could take over the Project. The meeting of the minds of between all parties was evidenced by the email between Glasgow and Nambiar on October 24, 2019, which shows that Madison had already offered them the B-Note on the Loan. **Exhibit D**. Ten days later, the Zegens and Glasgow all met with Barton in New York

and collectively pretended that Glasgow was a prospective equity investor to induce Barton to share confidential information. **Exhibit E.** Then, on November 15, Green Hollow and Madison executed a letter of intent on the B-Note purchase. **Exhibit F**. Thereafter, in emails exchanged during November and December 2019, Glasgow and Madison exchange numerous emails focusing on the prospect of foreclosing on the Land in the process of negotiating the Participation Agreement—months before any default event was alleged to have occurred. **Exhibit G**. Moreover, before, during, and after the execution of the Participation Agreement, Nambiar and HNGH informed Lender and Madison of the plan, and Lender and Madison agreed to participate in the plan, which allowed Nambiar, Glasgow, HNGH, and Green Hollow to attempt to foreclose on the Project by interfering with Plaintiffs' Investors and wrongfully triggering one or more default events giving HNGH the false appearance of taking control over the Project lawfully and through proper channels under claim of right. Moreover, the very terms of the Participation Agreement itself, giving HNGH rights that are entirely uncharacteristic, overly powerful, and commercially unreasonable for a "junior" participant in a Loan show the clear intent by all parties to achieve the ultimate result: providing a backdoor method for transferring the Loan and Land to HNGH.

117. The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course of action.

118. One of the members committed an unlawful and overt act to further the object or course of action, including but not limited to Defendants Nambiar and Glasgow's fraudulent representations and omissions regarding the Trade Secrets and confidential information they dishonestly obtained from Plaintiffs.

119. Plaintiffs have suffered injury and sustained damages as a result of the conspiracy

in an amount to be proven at trial.

120. Plaintiffs seek recovery of compensatory and exemplary damages jointly and severally for harm to Plaintiffs proximately resulting from the underlying fraud which Defendants conspired to commit, and which was in fact committed, against Plaintiffs.

## I. Count 9: Tortious Interference with Existing Contracts (Against Glasgow, Nambiar, HNGH, and Green Hollow)

121. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

122. Plaintiffs entered into a loan transaction with Lender, including but not limited to the Loan, Deed of Trust, and Guaranty Agreement.

123. Defendants Glasgow, Nambiar, Green Hollow, and HNGH, individually and collectively, have willfully and intentionally interfered with the Loan, Deed of Trust, and Guaranty Agreement by among other things, misusing Plaintiffs' confidential information, causing HNGH to pay taxes on the Land and asserting rights reserved solely to the Lender under the Deed of Trust, to which HNGH is a stranger, causing HNGH to demand payment of default interest under the Loan and Deed of Trust, to which HNGH is a stranger, and causing HNGH to threaten foreclosure on the Project without the right to do so. As a direct and proximate result of the actions of Glasgow, Nambiar, Green Hollow, and HNGH, Plaintiff 2999TC has been damaged due to the unreasonable interference and delay of the Project and detrimental impact on expected returns.

124. Plaintiffs had also entered into an agreement with Minkowitz under which Minkowitz agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. And Plaintiff 2999TC had entered into an agreement with Aju Hotels under which Aju Hotels agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. Nambiar discussed the Project with Minkowitz and

Aju Hotels, including at a meeting with Minkowitz, Aju Hotels, and others at the Virgin Hotel, knowing of Minkowitz's and Aju Hotels' agreements and/or intentions to invest into the Project and misrepresented to them that he owned the "Note" and made other statements and claims regarding the Project in order to persuade Minkowitz and Aju Hotels to back out of their investment in the Project. As a direct and proximate result of Nambiar's actions, Minkowitz and Aju Hotels each terminated their investment in the Project at that time, and Plaintiff 2999TC has been damaged, including, but not limited to, the loss of the investment by Minkowitz or Aju Hotels.

125. Plaintiffs seek compensatory damages in an amount to be proven at trial. Further, because Glasgow, Nambiar, Green Hollow, and HNGH's intentional interference was fraudulent and malicious, Plaintiffs seek exemplary damages in an amount to be determined by the jury.

### J. Count 10: Tortious Interference with Prospective Business Relations (Against Glasgow, Nambiar, HNGH, and Green Hollow)

126. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

127. Plaintiffs entered into a loan transaction with Lender, including but not limited to the Loan, Deed of Trust, and Guaranty Agreement.

128. Defendants Glasgow, HNGH, Green Hollow, and Nambiar, individually and collectively, have willfully and intentionally interfered with the Loan and Deed of Trust by among other things, misusing Plaintiffs' confidential information, causing HNGH to pay taxes on the Land and asserting rights reserved solely to the Lender under the Deed of Trust, to which HNGH is a stranger, causing HNGH to demand payment of default interest under the Loan and Deed of Trust, to which HNGH is a stranger, and causing HNGH to threaten foreclosure on the Project without the right to do so. As a direct and proximate result of the actions of Glasgow, Nambiar, Green Hollow, and HNGH, Plaintiff 2999TC has been damaged due to the unreasonable

interference and delay of the Project and detrimental impact on expected returns.

129. Plaintiffs had also entered into an agreement with Minkowitz under which Minkowitz agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. And Plaintiff 2999TC had entered into an agreement with Aju Hotels under which Aju Hotels agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. Nambiar discussed the Project with Minkowitz and Aju Hotels, including at a meeting with Minkowitz, Aju Hotels, and others at the Virgin Hotel, knowing of Minkowitz's and Aju Hotels' agreements and/or intentions to invest into the Project and misrepresented to them that he owned the "Note" and made other statements and claims regarding the Project in order to persuade Minkowitz and Aju Hotels to back out of their investment in the Project. As a direct and proximate result of Nambiar's actions, Minkowitz and Aju Hotels each terminated their investment in the Project at that time, and Plaintiff 2999TC has been damaged, including, but not limited to, the loss of the investment by Minkowitz or Aju Hotels.

130. Plaintiffs seek compensatory damages in an amount to be proven at trial. Further, because the Defendants' intentional interference was fraudulent and malicious, Plaintiffs seek exemplary damages in an amount to be determined by the jury.

## K. Count 11: Misappropriation of Trade Secrets and Confidential Information Under the Texas Uniform Trade Secrets Act (Against All Defendants)

131. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

132. Plaintiffs 2999TC and Barton are the owners of Trade Secrets related to the Project, including but not limited to, financial projections for the Project, the total amount of capital Plaintiffs intended to raise, the amount of capital Lender and Madison expected to contribute to the Project, the amount of debt the Project would incur, the identity of the Project's Investors, and

designs and plans for the entire development.

133. As described herein, these Trade Secrets have independent economic value from not being generally known or readily ascertainable through proper means by another person who could obtain economic value from disclosure or use of the information.

134. Plaintiffs have made and continue to make reasonable efforts to maintain the secrecy of their Trade Secrets by refusing to provide this information to any third parties who were not bona fide prospective investors.

135. Upon information and belief, Nambiar and Glasgow, acting individually and on behalf of Green Hollow and HNGH, intentionally and maliciously obtained Plaintiffs' Trade Secrets and confidential information, used the information to obtain a participation interest in the Loan, and proceeded to wrongfully compete with Plaintiffs by causing the Investors to back out of the Project and taking other actions to sabotage the Project by manufacturing defaults in the midst of a global pandemic in order to foreclose on the Land and take control of the Project. Glasgow and Nambiar were under a duty not to disclose the information Barton provided to them pursuant to an oral agreement not to disclose, and not to use the information to compete or otherwise injure Plaintiffs.

136. Upon further information and belief, Defendants Marc Zegen and Josh Zegen, individually and on behalf of Lender and Madison, intentionally and maliciously disclosed Plaintiffs' Trade Secrets and confidential information related to the Project to Glasgow, Nambiar, Green Hollow, and HNGH. Defendants were under a duty not to disclose pursuant to the covenant of good faith and fair dealing with Plaintiffs and the duty to refrain from interfering with or frustrating the business purpose of the Loan and Deed of Trust.

137. Defendants have actually misappropriated the Trade Secrets without the express or

implied consent of Plaintiffs to use, have access to, communicate, transmit, or disclose the Trade Secrets.

138. Plaintiffs seek recovery of actual loss caused by the misappropriation in an amount to be determined at trial, and for the unjust enrichment to Defendants in an amount to be determined at trial. In addition, pursuant to Texas Civil Practice and Remedies Code § 134A.004(b) and § 134A.005, because the Trade Secrets were willfully and maliciously misappropriated, Plaintiffs seek exemplary damages of not more than two times the amount of Plaintiffs' actual loss as determined by the jury and recovery of attorney fees.

**L. Count 12: Breach of Contract (Against Nambiar)**

139. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

140. Plaintiffs Barton and 2999TC entered into an oral agreement with Defendant Nambiar in consideration of the disclosure by Barton and 2999TC of certain confidential information and Trade Secrets related to the Project.

141. The agreement is an enforceable agreement between Plaintiffs and Nambiar.

142. Nambiar breached the agreement by disclosing Plaintiffs' confidential information and Trade Secrets and using this information to compete with Plaintiffs.

143. Nambiar's breach proximately caused harm to Plaintiffs.

144. Plaintiffs seek compensatory damages in an amount to be proven at trial due to the loss of investment, unreasonable delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project, along with Plaintiffs' reasonable attorney fees incurred in pursuing this action proximately arising from Nambiar's use and disclosure of Plaintiffs' confidential information and attempts to compete with Plaintiffs by seizing control of the Project, which could not have occurred but for Nambiar's breach.

**M. Count 13: Breach of Contract (Against Glasgow)**

145. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

146. Plaintiff Barton and 2999TC entered into an oral agreement with Defendant Glasgow in consideration of the disclosure by Barton and 2999TC of certain confidential information and Trade Secrets related to the Project.

147. The agreement is an enforceable agreement between Plaintiffs and Glasgow.

148. Glasgow breached the agreement by disclosing Plaintiffs' confidential information and Trade Secrets and using this information to compete with Plaintiffs.

149. Glasgow's breach proximately caused harm to Plaintiffs.

150. Plaintiffs seek compensatory damages in an amount to be proven at trial due to the loss of investment, unreasonable delay of the Project, including the inability to obtain additional debt and equity investment in order to complete the Project, along with Plaintiffs' reasonable attorney fees incurred in pursuing this action proximately arising from Glasgow's use and disclosure of Plaintiffs' confidential information and attempts to compete with Plaintiffs by seizing control of the Project, which could not have occurred but for Glasgow's breach.

**N. Count 14: Fraudulent Inducement (Against Lender and Madison)**

151. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

152. Lender and Madison made false representations to Plaintiffs in connection with entering into the Loan and Deed of Trust. Namely, that they would act in good faith in dealing with Plaintiffs regarding the Loan and Deed of Trust, and would assist Plaintiffs in raising money for the Project, yet secretly intending to completely divest themselves of any interest in Loan and sell a controlling interest in the Loan to Plaintiffs' competitor.

153. Lender and Madison made these statements to induce Plaintiff 2999TC to enter into the Loan and Deed of Trust.

154. Plaintiff 2999TC justifiably relied on such misrepresentations by entering into the Loan and Deed of Trust.

155. Lender and Madison's conduct described herein was both willful and malicious. As a result, Plaintiff 2999TC is entitled to recover punitive damages from Lender and Madison.

156. Lender and Madison made false representations to Plaintiff Barton in connection with entering into the Guaranty Agreement, namely, that it would act in good faith in dealing with Barton and with respect to the underling Loan and Deed of Trust.

157. Lender and Madison made these statements to induce Barton to enter into the Guaranty Agreement.

158. Barton justifiably relied on such misrepresentations by entering into the Guaranty Agreement, was harmed as a proximate result, and is entitled to recovery of actual damages.

159. Lender and Madison's conduct, as described herein, was both willful and malicious, and Barton is entitled to recover punitive damages from Lender and Madison.

**O. <u>Count 15: Declaratory Judgment (28 U.S.C. § 2201) – No Default</u>**

160. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

161. Plaintiff 2999TC has a justiciable interest in the Loan and Deed of Trust as a party to the agreement. Plaintiff Barton has a justiciable interest in the Loan and Deed of Trust because he is a principal of 2999TC and guarantor on the payment of the Loan along with numerous additional obligations under the Deed of Trust.

162. Plaintiffs seek a determination by this Court that 2999TC is not in breach or default of any terms of the Loan or Deed of Trust because any such alleged defaults were cured by

HNGH's voluntary payment of such sums, including tax payments, interest payments, and extension fees on its behalf as a third-party beneficiary.

163. Plaintiffs are entitled to recover reasonable and necessary attorney fees incurred in seeking this declaration.

**P. <u>Count 16: Declaratory Judgment (28 U.S.C. § 2201) – Participation Agreement</u>**

164. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

165. Plaintiff 2999TC has a justiciable interest in the Loan and Deed of Trust as a party to the agreement. Plaintiff Barton has a justiciable interest in the Loan and Deed of Trust because he is a principal of the 2999TC and guarantor on the payment of the Loan along with numerous additional obligations under the Deed of Trust.

166. Plaintiffs seek a determination by this Court that the Participation Agreement between Lender and HNGH was not permissible under the terms of Section 40 the Deed of Trust and/or under the covenant of good-faith and fair-dealing, and, further, that such an agreement materially altered the underlying obligations from that which Barton originally agreed to guaranty.

167. Plaintiffs further seek a declaration that Lender's entry into the Participation Agreement with HNGH was a breach of Lender's duty of good faith and fair dealing, which frustrated the commercial viability of the original agreement.

168. Plaintiffs further seek a declaration that the Participation Agreement between Lender/Madison and HNGH is void ab initio or, in the alternative, void as to each and every provision that provides HNGH with any rights of administration or control over the Loan or Deed of Trust, or any right foreclosure on the Land.

169. Plaintiffs are entitled to recover reasonable and necessary attorney fees incurred in seeking this declaration.

**Q. <u>Count 17: Declaratory Judgment (28 U.S.C. § 2201) – Performance Excused</u>**

170. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

171. Plaintiff 2999TC has a justiciable interest in the Loan and Deed of Trust as a party to the agreement. Plaintiff Barton has a justiciable interest in the Loan, Deed of Trust, and Guaranty Agreement because he is a principal of 2999TC and guarantor on the payment of the Loan along with numerous additional obligations under the Deed of Trust.

172. Plaintiffs seek a determination by this Court that the purpose of the Loan, Deed of Trust, and Guaranty Agreement were frustrated and performance rendered impossible by the shutdown orders arising from COVID-19, including Dallas County's Shelter in Place: Safer at Home Order and executive Order GA-14 by Texas Governor, Greg Abbot, which halted 2999TC's property-tax negotiations with Dallas County and other essential development requirements. At all times, Lender and Madison were aware that the entire purpose of the Loan was for development of commercial real estate in the luxury hospitality sector. Although the parties assumed the risk of general market volatility, the parties did not contemplate the shutdown of government operations and business functions arising from the executive and judicial orders of the state and county. These orders not only shut down Borrower's business, but shut down government offices that provide required permits, zoning approvals, and other construction-related authorizations for commercial real estate. As a result, Plaintiffs ask the Court to declare that the business purpose of the Loan was frustrated in a manner that neither party could have anticipated when entering into the Loan, Deed of Trust, and Guaranty Agreement.

173. Plaintiffs are entitled to recover reasonable and necessary attorney fees incurred in seeking this declaration.

**R. <u>Count 18: Declaratory Judgment (28 U.S.C. § 2201) – Assignment Void</u>**

174. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

175. Under standard contract law, assignments are generally not permitted in situations where they would disadvantage the obligor. "A contractual right can be assigned unless (a) the substitution of a right of the assignee for the right of the assignor would . . . materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance . . . ." Restatement (Second) of Contracts § 317(2) (1981). "What is . . . an increase in burden or risk . . . depends on the nature of the contract and on the circumstances." *Id.* cmt. d.

176. Plaintiff 2999TC has a justiciable interest in the Loan and Deed of Trust as a party to the agreement. Plaintiff Barton has a justiciable interest in the Loan, Deed of Trust, and Guaranty Agreement because he is a principal of 2999TC and guarantor on the payment of the Loan along with numerous additional obligations under the Deed of Trust.

177. As described herein, Turtle Creek and Madison's entry into the secret Participation Agreement with HNGH materially altered Plaintiffs' rights under the Loan and Deed of Trust. Even more so, Turtle Creek and Madison's assignment of the balance of the Loan and Deed of Trust entirely to HNGH has so unfairly altered the original agreement that it is manifestly a different contract altogether than the one Plaintiffs entered into with their original lender. Plaintiffs seek an equitable declaration from this Court that the HNGH Assignment is void ab initio.

178. Plaintiffs are entitled to recover reasonable and necessary attorney fees incurred in seeking this declaration.

## VI. <u>DEMAND FOR JURY TRIAL</u>

179. Plaintiffs hereby demand a trial by jury on all contested issues of fact set forth herein.

## VII. PRAYER

180. For all the foregoing reasons, Plaintiffs ask the Court to enter judgment in their favor and award the relief requested in Counts 1-17 above. In addition, Plaintiffs seek costs of court, prejudgment and post-judgment interest, and ask that the Court grant all other and further relief, at law or at equity, which it deems just and proper.

Dated: December 28, 2020.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Kelsey M. Taylor, Esq.**
Texas Bar No. 24098507
taylor.kelsey@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber, Esq.